IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

FREDDIE McCREA, JR.,
          Plaintiff,

vs.                                    Case No. 3:09cv68/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
          Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("the Act") and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("the Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record before this court, it is the opinion of the undersigned that the decision of the Commissioner denying benefits is supported by substantial evidence and the result of the application of proper legal standards; the court therefore recommends that the decision be affirmed.

I.      PROCEDURAL HISTORY

Plaintiff's application for SSI benefits was denied initially (Tr. 62–64)[1] and on reconsideration (Tr. 66–68).  On May 30, 2008, following a hearing held on April 18, 2008, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 15–30).  On February 2, 2009, the Appeals Council denied Plaintiff's request for review (Tr. 5–7), making the decision of the ALJ the "final decision" of the Commissioner and subject to judicial review in this court under 42 U.S.C. § 405(g).  Ingram v. Commissioner of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.     FINDINGS OF THE ALJ

In his May 20, 2008, decision the ALJ made the following findings (Tr. 17–29):

1)      Plaintiff has not engaged in substantial gainful activity since September 26, 2005, the date he applied for SSI (20 C.F.R. §§ 416.920(b) and 416.971 *et seq*.).[2]

2)      Plaintiff has the following severe impairments: polysubstance abuse; history of cancer of the bladder, status post resection with urostomy placement and residual right testicular pain; hypertension; depressive disorder, not otherwise specified; and estimated borderline intellectual functioning (20 C.F.R. § 416.920(c)).

3)      Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

4)      Plaintiff has the residual functional capacity ("RFC") to perform a full range of unskilled, medium work, restricted to minimal contact with the general public and co-workers (20 C.F.R. § 416.967(c)).

---

[1] All references to "Tr." refer to the transcript of the Social Security Administration record filed on April 30, 2009 (Docs. 5, 6).

[2] An SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file.  Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing 20 C.F.R. § 416.202–03 (2005)).  As Plaintiff applied for SSI payments on September 26, 2005, his instant appeal requires a showing of disability between that date and the date of ALJ's decision which, as noted, was issued on May 20, 2008.  *See id.*

5)  Plaintiff is capable of performing past relevant janitorial work which, according to vocational expert ("VE") testimony and the <u>Dictionary of Occupational Titles</u> (Code 381.687-018), is classified as medium in exertion and unskilled in ability. This work does not require the performance of work-related activities precluded by Plaintiff's RFC (20 C.F.R. § 416.965).

6)  Plaintiff has not been under a disability, as defined in the Act, since September 26, 2005 (20 C.F.R. § 416.920(f)).

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and is a result of the application of proper legal standards. <u>Carnes v. Sullivan</u>, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 (11th Cir. 1997); <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." <u>Boyd v. Heckler</u>, 704 F.2d 1207, 1209 (11th Cir. 1983) (*superseded by statute on other grounds as stated in* <u>Elam v. R.R. Ret. Bd.</u>, 921 F.2d 1210, 1214 (11th Cir. 1991)). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if, in light of the record as a whole, the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); <u>Falge</u>, 150 F.3d at 1322; <u>Lewis</u>, 125 F.3d at 1439; <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.       If the claimant is performing substantial gainful activity, he is not disabled.

2.       If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.       If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.       If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.       Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.       BACKGROUND

A.      Personal and Employment History

Plaintiff was born on October 8, 1955, making him fifty-two years of age at the time of the April 18, 2008, administrative hearing.  Plaintiff testified at the hearing that he had attended high school through the eleventh grade and had also attended vocational school.  He could read a little.  Plaintiff previously worked in the paint and auto body business; he also worked as a janitor and as a stevedore.  Plaintiff was incarcerated in Ohio for sixteen years for voluntary manslaughter.  While in prison Plaintiff built wheelchairs; after Plaintiff was released from prison in 2003, he again worked in the paint and auto body business and as a janitor.  Plaintiff stopped working in 2005 due to pain in his right testicle caused by nerve damage that occurred during bladder cancer surgery in 1993.  In addition to pain, Plaintiff's ability to work is affected by having to wear a nephrostomy bag, which frequently comes loose and leaks urine.

Plaintiff stated that his testicular pain is constant and severe, awakening him from sleep and causing him to limp.  Plaintiff acknowledged that he has used marijuana and cocaine for pain relief, the last time about three weeks prior to the hearing, but indicated that he planned to participate in a substance abuse program at the Lakeview Center in Pensacola, Florida.  Plaintiff also testified that he suffers from depression.  According to Plaintiff, when he was a child he was molested; also, his father left the family when he was very young.  Plaintiff also recalled that "when I killed a guy, I hear[d] [my father] talking to me" (Tr.  402).  Plaintiff stated that he carries a mechanical singing fish with him because he is sad about his life and the fish makes him feel happy.  Plaintiff testified that his prescribed medications include Zoloft, Elavil, blood pressure medication, sleep medication, and pain medication.

B.      Records of Psychiatric Assessment and Treatment[3]

The administrative file contains records for several mental evaluations Plaintiff underwent prior to his alleged disability date of September 26, 2005.  The earliest of these assessments is dated June 29, 2004 (Tr. 190–91).  The diagnosis was depressive disorder, not otherwise specified, with

---

[3] Unless otherwise noted, the information in this and the following section is derived from the opinion of the ALJ or from references to the record cited by Plaintiff.

Case No. 3:09cv68/MCR/EMT

an estimated Global Assessment of Functioning ("GAF") score of 50 at that time.[4]  Plaintiff was also evaluated at the Lakeview Center on August 25, 2004 (Tr. 187–89).  The clinical impression was major depression; rule out substance-induced mood disorder; history of polysubstance abuse and dependence; rule out current substance abuse; rule out organic affective syndrome; and personality disorder (not otherwise specified) with antisocial features.  Treatment with antidepressant medication and participation in a twelve-step program were recommended.  Plaintiff's GAF was estimated to be 45–50.  Plaintiff underwent a disability assessment on December 7, 2004 (Tr. 211–15).  The diagnosis was dysthymic disorder, somatoform disorder (not otherwise specified), and low average intelligence.  Plaintiff appeared to be suffering from a longstanding depressive disorder, which impacted his physical health and lifestyle.  Plaintiff's GAF was estimated to be from 58 to 62.[5]

On November 29, 2005, which was after Plaintiff's alleged disability onset date, W. Michael Nelson, Ph.D., of the Psychological Services Center in Cincinnati, Ohio, prepared a disability evaluation of Plaintiff (Tr. 257–62).  Dr. Nelson diagnosed Plaintiff with dysthymic disorder, post-traumatic stress disorder, and mild mental retardation to borderline intellectual functioning.  Plaintiff was "markedly impaired by [h]is feelings of distress, as well as his estimated MR [mental retardation] to borderline level of intelligence" (Tr. 261).  Dr. Nelson opined that Plaintiff "would not be able to relate sufficiently to co-workers or supervisors for simple, repetitive tasks at this time. He related in a depressed fashion during the psychological assessment to this evaluator.  He would not be able to effectively deal with the public because of such difficulties" (*id.*).  Additionally, Dr. Nelson noted that Plaintiff's "mental ability to understand, remember, and follow instructions is moderately to markedly impaired by his estimated mild MR to possibly borderline level of intelligence" (*id.*).  According to Dr. Nelson, Plaintiff's "mental ability to withstand the stress and

---

[4]  The GAF is a rating of overall psychological functioning on a scale of 0-100.  *Diagnostic and Statistical Manual of Mental Disorders* 34 (2000, 4th ed., text revision) ("DSM-IV-TR").  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV-TR 32. A score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning (*id.*).

[5]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR 32.

pressure associated with day-to-day work activity is moderately to markedly impaired" (*id.*). Dr. Nelson further opined that Plaintiff's mental ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive and/or routine tasks was impaired. Plaintiff demonstrated moderate problems with attention and concentration during the clinical interview. His pace and persistence were problematic for all clinical interactions. Dr. Nelson further found that Plaintiff's mental ability to withstand the stress and pressure associated with day-to-day work activity was moderately to markedly impaired. Plaintiff also showed marked mental limitations in the areas of comprehension due to the combined effects of mild mental retardation to borderline intellectual functioning and his psychiatric symptoms. Dr. Nelson concluded that Plaintiff did not have the mental ability to perform even simple, repetitive work tasks. Plaintiff's current GAF was 50.

Records dated November 14, 2006, from the Central Community Health Board ("CCHB"), which apparently is located in Cincinnati, Ohio, reflect that Plaintiff was diagnosed with major depressive disorder, recurrent, severe with psychotic features; and polysubstance dependence (Tr. 304–05). A CCHB assessment dated November 20, 2006 (Tr. 297–303), indicates that Plaintiff had a long history of chronic substance abuse, including occasionally during the previous six months. The assessment notes Plaintiff's report that he "[h]ears voices telling him to kill people. Spent 16 years in prison for murder. States he still feels like killing people at times. States he hit a guy on the head with a hammer the other day because he kept bothering him" (Tr. 301). Plaintiff's potential for homicidal/violent behavior was estimated to be "high" (Tr. 302). On August 1, 2007, Plaintiff presented for an intake interview at CCHB (Tr. 296); a progress note dated September 28, 2007 (Tr. 291), reflects Plaintiff's report that he was taking his medications as prescribed. Plaintiff was neatly dressed and well groomed, alert, oriented, and appropriately responsive and talkative. He maintained good eye contact, was cooperative and interested in the intervention, and stated that the help he was receiving was beneficial.

Plaintiff was seen at the Lakeview Center in Pensacola, Florida on December 20, 2007, when he was diagnosed with major depressive disorder, recurrent, moderate (Tr. 324–26). His GAF was 45. Plaintiff was admitted to the facility on January 2, 2008, when his history of substance abuse, depression, and pain from medical conditions was noted; a prior Baker Act hospitalization due to homicidal thoughts and previous commission of homicide were also noted (Tr. 327–28). Plaintiff's

GAF was estimated to be 40.[6]  A discharge note dated January 23, 2008, reflects diagnoses of depression, not otherwise specified; cocaine abuse and dependence; marijuana abuse; and substance-induced mood disorder (Tr. 329–30).  Plaintiff was alert and interacting appropriately, with no thoughts of hurting himself or others.  His intellectual functioning was low.  Described as displaying questionable insight and judgment, Plaintiff tended to minimize his drug addiction, which he blamed on chronic pain.  He did not appear to be an immediate danger to himself or others and was able to discern right from wrong.  Plaintiff was discharged with medications and instructions to follow up with a physician at the Lakeview Center as well as his primary care physician; he was also advised to attend recovery programs such as Alcoholics Anonymous.  His GAF was estimated to be 45.  Plaintiff was seen at the Lakeview Center on March 11, 2008, for follow-up (Tr. 331).  Plaintiff admitted smoking marijuana for pain relief and indicated that he wanted counseling and to get back on his prescribed medications, as he had felt somewhat depressed since being off them.  He was cooperative, alert, and interacted appropriately, with no reported auditory or visual hallucinations, suspiciousness, or paranoia and no thoughts of harming himself or others.  Plaintiff's GAF was estimated to be 55.

  C.  Records of Medical Assessment and Treatment

  Plaintiff was treated at the Escambia Community Clinic, in the Pensacola, Florida, area, for hypertension, testicular pain, ostomy status, and/or positive hepatitis B and C status twice in June 2004 (Tr. 201–05) and twice in August 2004 (Tr. 195–200).  An entry dated September 24, 2004, indicates that Plaintiff complained of continued difficulty with ostomy leakage, depressed mood, and stress due to health problems (Tr. 192).  His mental status was described as alert and, other than testicular pain and slightly elevated blood pressure, his physical findings were essentially normal at that time.

  With respect to events that occurred after Plaintiff's alleged onset date of September 26, 2005, the record reflects that Plaintiff was hospitalized from September 18, 2005, through September 22, 2005, after he presented to an emergency room complaining of midline lower epigastric

---

[6]  A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  DSM-IV-TR 32.

abdominal pain associated with nausea and vomiting (Tr. 234–56).  Plaintiff's discharge diagnosis was partial small bowel obstruction, resolved; hypertension; hepatitis C; and history of bladder cancer.

On April 3, 2007, Karl Hammonds, M.D., a general medical resident with the University Hospital, Cincinnati, Ohio, completed a questionnaire indicating that Plaintiff's diagnoses included hypertension, chronic right testicular pain, history of bladder cancer, depression, and hepatitis C (Tr. 323).  He indicated that Plaintiff was unable to work at that time because of chronic pain and a poorly functioning urostomy site.  Plaintiff's inability to work was expected to last from six months to one year.  In a letter dated July 27, 2007, Dr. Hammonds again indicated that Plaintiff suffered from chronic pain related to a prior surgery (Tr. 289).  This surgery had left him with the need for a urostomy bag to be attached to his abdomen.  It was Dr. Hammonds' opinion that Plaintiff was unable to work at that time given his condition.

In December 2007 Plaintiff was again seen at the Escambia Community Clinic; he was diagnosed with depressive disorder, ostomy status, and benign essential hypertension (Tr. 354).  Other than testicular pain, minor nasal symptoms, and slightly elevated blood pressure, Plaintiff's physical examination was unremarkable (Tr. 353).  He was referred to the Lakeview Center and to a urologist for further evaluation and dispensed medications for his depression and hypertension, as well as dressing materials for his ostomy.  Reports of January 2008 and March 2008 assessments and treatment for depressive disorder, ostomy status, hypertension, and hepatitis were similar, although in March 2008 Plaintiff was also seen for a urinary tract infection, arm numbness, and hepatis B and C status  (Tr. 351, 344).  It was also noted in March 2008 that  Plaintiff was "demanding referrals, disability paper, and refusing to do any work for food stamps" (Tr. 342).

Plaintiff's administrative file also contain the reports of several emergency room visits in 2008.  He presented to the Baptist Hospital emergency room in January 2008 (Tr. 362–73).  The clinical impression was elevated blood pressure, acute, secondary to medication noncompliance.  Additionally, the record reflects an apparently normal physical examination, an electrocardiogram which revealed no acute changes, unremarkable blood test results, and a urine toxicology screen which was positive for cocaine and cannabinoid.  Plaintiff was treated with medication and discharged in stable condition.  Plaintiff returned to the Baptist Hospital emergency room on

February 25, 2008, again for treatment of elevated blood pressure that was attributed to medication noncompliance (Tr. 374–79).

Sunil Gupta, M.D., wrote in a March 13, 2008, letter that an eye examination of Plaintiff revealed "vision of 20/400 in the right and 20/40 in the left.  The patient has extensive macular edema in each eye and has no history of diabetes.  The findings are most consistent with hypertensive related retinopathy and exudative changes in the macula." (Tr. 336).  Dr. Gupta noted that Plaintiff's "blood pressure was 200/130 and this is the basis for why he is developing these changes" (*id.*).

On March 27, 2008,  P.K. Garg, M.D., completed a questionnaire indicating that Plaintiff was temporarily unable to work, pending gastrointestinal and urological evaluations (Tr. 309).  Dr. Garg further noted that Plaintiff was limited by chronic pain and a poorly functioning urostomy site, status post bladder cancer surgery.

David Criner, CRC, prepared a Functional Assessment Form for Plaintiff dated April 17, 2008, based on an interview he conducted with Plaintiff and a review of Plaintiff's Lakeview Center records (Tr. 382–83).  Mr. Criner opined that Plaintiff had experienced a significant loss of psychological, physiological, personal and social adjustment, resulting in severe psychiatric impairment.  Plaintiff did  not have the qualifications by reason of education, training, or experience to perform the limited duties for which he was psychologically capable.  His condition was likely to be permanent.[7]

C.       Other Records Within Plaintiff's Administrative File

On January 20, 2005, at the direction of the Social Security Administraion, a non-examining consultant completed a Mental RFC Assessment (Tr. 230–33) and Psychiatric Review Technique ("PRT") form for Plaintiff (Tr. 216–228).  Assessing Plaintiff's dysthymic disorder and somatoform

---

[7]  Mr. Criner estimated that Plaintiff was moderately limited in his ability to perform repetitive tasks and to understand, carry out, and remember instructions.  In Mr. Criner's opinion, Plaintiff had moderately severe limitations with respect to constriction of interests; responding appropriately to supervision; performing tasks involving minimal intellectual effort; performing intellectually complex tasks requiring higher levels of reasoning, math and language skills; performing varied tasks; and making independent decisions.   Plaintiff was severely limited with respect to the ability to relate to other people; perform work requiring regular contact with others; supervise or manage others; perform under stress; and work in situations that require speed and/or sustained attention.  Plaintiff was also severely restricted with respect to the ability to perform daily activities.

disorder, the consultant opined that Plaintiff's allegation of disability was partially credible. Plaintiff's records supported a mental health diagnosis and his symptoms could be expected to limit his ability to maintain attention and concentration with respect to complex details. He was capable of performing simple routine tasks and was not severely impaired in his ability to interact with others.[8] Another Mental RFC Assessment and PRT form were completed on December 28, 2005, by a different consultant who considered Plaintiff's dysthymia, borderline intelligence, and anxiety (Tr. 263–280). He concluded that, based on Plaintiff's lengthy history of performing semi-skilled work, he should be able to function at least at the borderline level of intelligence (Tr. 265). "Despite his presentation, [Plaintiff] would be able to complete simple, one to two step tasks in an environment with minimal contact with the general public and with coworkers" (id).[9]

The record also contains consultative evaluations of Plaintiff's medical conditions. On April 25, 2006, noting Plaintiff's conditions of status post resection of bladder carcinoma and urostomy placement, a non-examining medical consultant concluded in a Physical RFC assessment that Plaintiff was capable of performing medium work (Tr. 281–88).[10] Plaintiff could occasionally lift/carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push

---

[8] The consultant concluded that Plaintiff had mild limitations in restriction of activities of daily living and difficulties in maintaining social functioning; a moderate limitation in difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation (Tr. 226). Plaintiff was moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting (Tr. 230–31).

[9] The consultant concluded that Plaintiff had a mild limitation in restriction of activities of daily living and moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace (Tr. 277). He had no episodes of decompensation (id.). Plaintiff was moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting (Tr. 263–64). Plaintiff was markedly limited in his ability to interact appropriately with the general public (Tr. 264).

[10] Medium work is defined as work that involves lifting no more than fifty pounds at a time, with frequent lifting or carrying objects that weigh twenty-five pounds. 20 C.F.R. § 416.967(c).

and/or pull unlimited weights, other than as noted for lifting and/or carrying.  The consultant also noted that Plaintiff had high blood pressure but was noncompliant with medications.  Plaintiff was restricted to occasionally stooping, kneeling, crouching and crawling, and totally restricted from climbing ladders, ropes, or scaffolds.

On an April 16, 2008, Clinical Assessment of Pain form, David W. Fisher, M.D., reported that Plaintiff had pain "to such an extent as to be distracting to adequate performance of daily activities or work" (Tr. 356).[11]  With respect to what extent physical activity would increase Plaintiff's pain, Dr. Fisher indicated that he would experience "[g]reatly increased pain and to such a degree as to cause distraction from task or total abandonment of task" (*id.*).  Dr. Fisher also indicated that Plaintiff had an "underlying medical condition consistent with the pain he experiences" (*id.*).  Dr. Fisher also completed a Physical Capacities Evaluation which indicated that Plaintiff could sit a maximum of four hours in an eight-hour workday (Tr. 357).  He could sit thirty minutes at any one time, stand and walk a maximum of one hour in an eight-hour day, and stand and walk thirty minutes at any one time (*id.*).  Plaintiff needed to rest, recline or lie down four times a day for twenty to thirty  minutes (*id.*).  His limitations had lasted or could be expected to last for twelve continuous months or longer.

V.    DISCUSSION

Plaintiff seeks remand of this action on the ground the ALJ exhibited bias toward him at the administrative hearing.  More specifically, according to Plaintiff, in discussing Plaintiff's use of illicit drugs the ALJ announced and relied on an incorrect legal standard which, although not repeated in the written decision, resulted in the adverse finding of "not disabled."  Plaintiff points to the following exchange in the ALJ's questioning of Plaintiff during the administrative hearing:

Q      When was the last time you used dope?

A      About three weeks ago.

Q      You see that's what takes you out of the ball park for this whole application of yours, because people who are using drugs are not eligible.  It is material to the disability.

---

[11]  The ALJ describes Dr. Fisher as being an "unknown source" and the record as containing no information about his address, credentials, etc. (Tr. 27).  Plaintiff does not dispute these statements but the court notes that they are incorrect.  The court was able to identify Dr. Fisher by his signature (Tr. 356) and his curriculum vitae (Tr. 310–22).

A    Yes, sir.

Q    And, in your case any problems that you have that would take you outside of light work, and the depression and the mental problems, like that, are all situational and caused by drug use. (Tr. 397–98).

According to Plaintiff, the ALJ's statements are a clear departure from the correct standard for evaluating drug addiction and alcoholism, as set forth in Social Security Ruling ("SSR") 82-60.[12] Plaintiff further argues that the ALJ's misstatement of the legal standard during the hearing and his omission of it from the written decision suggest that the ALJ acted intentionally and, thus, with bias in reaching his disability determination. Furthermore, Plaintiff argues, the ALJ found that he was not disabled despite ample, substantial evidence in the record to support a finding of disability. In the interest of justice, Plaintiff submits, this matter should be remanded to the Commissioner so that he may have an unbiased, fair hearing before a different ALJ.

The Commissioner responds that while the ALJ's statement regarding Plaintiff's illegal drug use may not have been elegantly phrased, it was not error. Applying the correct standard, the ALJ found in his written decision that Plaintiff was not disabled, even taking into consideration the effects of his illegal drug use. Moreover, the ALJ's comments did not indicate any bias or predisposition to rule against Plaintiff. Finally, the Commissioner argues, the ALJ's determinations are supported by substantial evidence. According to the Commissioner, the ALJ's decision should be affirmed because he afforded Plaintiff a full and fair administrative hearing and the finding of "not disabled" is well-supported by the record.

As an initial matter, the court concludes that the ALJ's statements at the administrative hearing, quoted above, are not—at least when taken alone—an accurate expression of the law regarding addiction and eligibility for Social Security benefits. In 1996 Congress amended the Act

---

[12] Social Security Ruling 82-60 provides that

> Drug addicts or alcoholics cannot be considered 'disabled' on the basis of that diagnosis alone; on the other hand, a diagnosis of drug addiction or alcoholism should not have an effect on a disability evaluation that is adverse to the applicant. . . . It is necessary to evaluate the severity of the impairment which may be associated with, manifested by, result from, or coexist with these diagnoses.

SSR 82-60.

Case No. 3:09cv68/MCR/EMT

to eliminate drug and alcohol addiction as a basis upon which to receive disability insurance benefits and SSI.  *See* Doughty v. Apfel, 245 F.3d 1274 (11th Cir. 2001) (discussing the Contract with America Advancement Act of 1996 ("CWAAA"), Pub. L. No. 104–121, 110 Stat. 847 (amending 42 U.S.C. § 423(d)(2)).  The CWAAA in part provides that a Social Security claimant "shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." Pub. L. No. 104-121, § 105(a)(1), (b)(1), 110 Stat. 847, 852, 853 (codified as amended at 42 U.S.C. § 423(d)(2)(C) (1997)).  The regulations which implement section 423(d)(2)(C) provide that once the Commissioner determines a claimant is disabled and finds medical evidence of drug addiction or alcoholism, the Commissioner then "must determine whether . . . drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535.  Whether drug addiction or alcoholism is a contributing factor material to the determination of a disability (the "materiality determination") is based on whether the claimant would still be found disabled if he stopped using drugs or alcohol.  *See* 20 C.F.R. § 404.1535(b)(1); *see also* Doughty, 245 F.3d at 1280 (holding that claimant bears burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination). Thus, even a claimant who is found to be disabled and who is addicted to drugs or alcohol may still be eligible for benefits provided he has met his burden of showing that the addiction is not a contributing factor material to the disability determination.   The ALJ's statement at the administrative hearing suggests otherwise, that is, that any claimant who uses illicit drugs is completely ineligible for Social Security disability benefits.  This is not a correct, or at least not a complete, expression of the law.  Regardless, the court perceives no error in the ALJ's written decision regarding his consideration of Plaintiff's drug abuse.  Indeed, as explained briefly below, contrary to Plaintiff's undeveloped argument to the contrary, the court is persuaded that substantial medical evidence supports the ALJ's determination that Plaintiff is not disabled.[13]

---

[13] Plaintiff cites only twenty-one pages of the two hundred and two pages of medical records and argues only that "there was ample competent substantial evidence in the record to support a finding of disability, and yet, [Plaintiff] received an unfavorable decision" (Doc. 8 at 8).  To the extent the first clause of this cursory sentence is intended to stand alone as a challenge to the quantum of evidence, rather than simply to support of the claim of bias, the court addresses it below in like fashion, i.e., cursorily.

In his sixteen-page decision the ALJ completed a thorough summary of Plaintiff's medical and psychiatric records, including the numerous evaluations Plaintiff underwent.  The ALJ concluded that Plaintiff retained the RFC to perform unskilled medium work with minimal contact with the general public and co-workers.  In reaching this determination, the ALJ considered, but gave little or no weight to, the opinions of Dr. Fisher, Dr. Hammonds, Dr. Garg, Dr. Nelson, and Mr. Criner.  The ALJ discounted their opinions in part on the grounds that it was unclear how often and under what circumstances these individuals may have treated Plaintiff and that there were no citations to medical evidence in support of their assessments (Tr. 27).  Although substantial weight should be given to the opinions, diagnosis, and medical evidence of a treating source, *see* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527(d), in this case Plaintiff points to nothing that establishes that any of these individuals in fact was a treating source.  Even if Dr. Fisher, Dr. Hammonds, Dr. Garg, or Mr. Criner were treating sources, good cause existed for the ALJ to decline to grant substantial weight to their opinions, as the opinions were conclusory and not supported by reference to objective medical evidence of record.  *See* Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (indicating that good cause for refusing to give great weight to the opinion of a treating source exists when the opinion was not bolstered by the evidence, evidence supported a contrary finding, or the opinion was conclusory or inconsistent with the source's own medical records); Lewis, 125 F.3d at 1440.  The ALJ gave little weight to Dr. Nelson's November 29, 2005, disability evaluation (Tr. 257–62) on the grounds Dr. Nelson had seen Plaintiff only on one occasion and that his opinion was inconsistent with the evidence as a whole (Tr. 28).  These reasons for refusing to grant substantial weight to Dr. Nelson's opinion are supported by the record and thus are sufficient.  *See* Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986) (noting that rule giving great weight to treating source's opinion does not apply where source has only examined patient one time); Phillips, 357 F.3d at 1240–41.

---

The court again notes its role in this appeal: it may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin, 894 F.2d at 1529.  Moreover, even if there is a preponderance of evidence against the Commissioner's decision, the appellate court must confirm the decision if it is supported by substantial evidence.  Sewell, 792 F.2d at 1067.

The ALJ's finding that Plaintiff can perform unskilled medium work with minimal contact with the general public and co-workers is adequately supported by the Physical RFC assessment dated April 25, 2006 (Tr. 281–88),[14] and the December 2007, January 2008, and March 2008 records from the Escambia Community Clinic which reflect essentially normal physical examinations (Tr. 342–45; 349–51; 352–54). Additionally, the ALJ's determination that Plaintiff has the mental capability to perform unskilled work is supported by Dr. Sexton's conclusion that Plaintiff could handle simple, repetitive-type tasks and carry out simple instructions (Tr. 215), as well as the opinion expressed in the Mental RFC assessment dated January 2005 that Plaintiff could perform simple routine tasks (Tr. 230). The ALJ's determination that Plaintiff should have only minimal contact with the general public and co-workers is also supported by Dr. Sexton's opinion that Plaintiff's ability to interact with people was fair (Tr. 215). The Mental RFC assessment dated December 2005 likewise supports the ALJ's findings that Plaintiff could perform unskilled work with minimal contact with the public and co-workers (Tr. 265). The ALJ determined at step four of the sequential analysis that Plaintiff's impairments did not prevent him from doing his past relevant work as a janitor and thus he was not disabled. Although the testimony of a VE is not required at step four, *see* Lucas v. Sullivan, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990); *but see* SSR 82-61 (recognizing that a VE may be appropriate at step four), the VE's testimony in this case provides additional evidence in support of the ALJ's finding that Plaintiff is not disabled. Responding to a hypothetical question posed by the ALJ, the VE testified that an individual who was restricted to standing for six hours and sitting for six hours due to prior bladder cancer surgery and nephostomy; had high blood pressure; and was fairly noncompliant with medications was physically able to work as a paint and body worker and as a janitor[15] (Tr. 404–05). In short, the court concludes that substantial evidence supports the ALJ's RFC findings.

---

[14] Citing the evidence of record, including Plaintiff's essentially normal physical examinations in January and March 2008, the ALJ did not accept the opinion in the April 25, 2006, RFC assessment regarding Plaintiff's limited ability to stoop, kneel, crouch, crawl, and climb.

[15] The ALJ also stated to the VE that Plaintiff reported drowsiness and depression as a result of his self-medicating with narcotics. The ALJ informed the VE, however, that he would not consider those reports "because that is strictly drug induced and it is material to the depression, not to the carcinoma surgery" (Tr. 404).

Finally, the court considers the central theme of Plaintiff's argument for remand, his contention that the ALJ's inaccurate statement of the law at the hearing—and its omission from the written decision—demonstrate that the ALJ was biased.

The Eleventh Circuit has observed that "[t]he Social Security Act requires that a claimant's hearing be both full and fair." Fries v. Commissioner of Soc. Sec. Admin., 196 F. App'x 827, 830 (11th Cir. 2006) (per curiam) (citing Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996) (per curiam)). A presumption of honesty and integrity exists in those who serve as adjudicators for administrative agencies. Schweiker v. McClure, 456 U.S. 188, 195–96, 102 S. Ct. 1665, 72 L. Ed. 2d 1 (1982); Withrow v. Larkin, 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975). The burden of overcoming this presumption rests on the party asserting bias, who must rebut the presumption by showing a conflict of interest or some other specific reason for disqualification. McClure, 456 U.S. at 195–96. Additionally, the party must come forward with convincing evidence that "a risk of actual bias or prejudgment" is present. Id. Finally, for the alleged bias to be disqualifying, it must "stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966).

In this case, the court concludes that Plaintiff has failed to overcome the presumption of honesty and integrity vested in the ALJ. While Plaintiff asserts the ALJ must have been influenced adversely by Plaintiff's admitted use of illicit drugs, he has not presented any convincing evidence of the risk of actual bias or prejudgment by the ALJ. Plaintiff's attorney apparently recognizes this void, stating in his memorandum that the ALJ's conduct "suggests to the undersigned counsel that the ALJ actually knew that his was not an appropriate standard of evaluation despite his representation to the contrary" (Doc. 8 at 8, emphasis in original). Counsel continues, asking the rhetorical question: "Otherwise, why would he not explicitly rely upon it in rendering his unfavorable decision?" (id). Indeed, Plaintiff points to no errors of law in the ALJ's written decision regarding Plaintiff's drug abuse or other aspects of his decision, and the court has identified none. Moreover, as outlined above, there is substantial evidence to support the ALJ's decision that Plaintiff is not disabled. The brief, perhaps carelessly worded statement made by the ALJ at the hearing does not demonstrate bias toward Plaintiff—does not even create the appearance of

bias—nor does the statement's absence from the ALJ's written decision suggest bias.[16]  In light of the requirements necessary to make out a claim of judicial bias, and in consideration of the arguments set forth by Plaintiff, the court concludes that Plaintiff has failed to show disqualifying bias on the part of the ALJ or that the April 18, 2008, hearing was anything but full and fair.


VI.     CONCLUSION

        For the foregoing reasons, the court concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.  Furthermore, the court concludes that Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

        Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that this file be **CLOSED**.

        At Pensacola, Florida this 18ᵗʰ day of December 2009.



                        /s/ Elizabeth M. Timothy
                        **ELIZABETH M. TIMOTHY**
                        **UNITED STATES MAGISTRATE JUDGE**




                        **NOTICE TO THE PARTIES**

        **Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of**

---

        [16] Because the ALJ did not find that Plaintiff was disabled, despite the evidence of Plaintiff's polysubstance abuse, it was unnecessary for the ALJ to make a materiality determination.  See 20 C.F.R. § 404.1535(b)(1).

Case No. 3:09cv68/MCR/EMT

**appellate review of factual findings.** *See* **28 U.S.C. § 636;** <u>**United States v. Roberts**</u>**, 858 F.2d 698, 701 (11th Cir. 1988).**